1 | William J. Edelman (SBN 285177)
**MILBERG, PLLC**
2 | 227 W. Monroe Street, Suite 2100
Chicago, IL 60606
3 | Phone: 866.252.0878
wedelman@milberg.com
4 |

5 | *Attorney for Plaintiff and Proposed Class*
*(Additional Counsel on Signature Page)*

6 | **UNITED STATES DISTRICT COURT FOR THE**
7 | **CENTRAL DISTRICT OF CALIFORNIA**

8 |
9 | Nicole Chmura on behalf of herself and all others similarly situated,  | Case No.
10 |
11 | Plaintiff, | **CLASS ACTION COMPLAINT FOR:**
12 | v. | 1. **VIOLATIONS OF DMCA, 17 U.S.C. § 1201(a)**
13 | SNAP INC.,
14 | Defendant. | **JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiff, Nicole Chmura ("Plaintiff") brings this class action complaint ("Complaint") on behalf of herself and all others similarly situated (the "Class Members") against Snap Inc., ("Snapchat" or "Defendant") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to herself and her own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Snapchat's unauthorized acquisition—through scraping, bulk downloading, and other extraction methods—of various content creators' YouTube-hosted audiovisual works ("Works") at the file level by bypassing YouTube's technological measures that control access to those Works and Snapchat's use of those unlawfully accessed Works to train, develop, and improve Snapchat's artificial intelligence ("AI") systems.

2. YouTube makes creators' videos available to the public primarily through controlled streaming pathways and related authorized features. YouTube also employs technical measures designed to control access to the underlying audiovisual files and to prevent bulk extraction by automated systems.

3. YouTube's technical controls are designed to provide access through user-based streaming and to prevent non-authorized bulk extraction. At the scale required for modern AI training, like those created by Snapchat, obtaining file-level copies of the Works necessarily requires bypassing those controls.

4. Snapchat did not obtain licenses or permissions from Plaintiff and Class members for the file-level acquisition and use of their Works as training inputs for its AI models. Instead, on information and belief, Snapchat used or relied on circumvention tools and services to defeat YouTube's technological measures at scale.

5. The DMCA prohibits circumventing a technological measure that effectively controls access to a copyrighted work, and it prohibits trafficking in circumvention technologies and services. 17

2

**CLASS ACTION COMPLAINT**

U.S.C. § 1201(a). Plaintiff seeks injunctive relief, statutory damages, and other remedies authorized by 17 U.S.C. § 1203.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Snapchat. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, et seq. (the Digital Millenium Copyrights Act ("DMCA")).

7. This Court has personal jurisdiction over Defendant because Snapchat has their principal place of business in Santa Monica, California and transacts business nationwide, and committed the acts complained of in this District and/or directed them at this District, causing harm here.

8. Venue is proper in this District because Snapchat resides in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

9. Plaintiff reserves the right to refine jurisdiction and venue allegations after discovery and as additional facts become available.

## THE PARTIES

10. Plaintiff, Nicole Chmura, is a resident of California and the owner and operator of the YouTube channel "Let's Go Team." The channel features videos documenting Plaintiff Chmura's own personal travel experiences, which she independently records and publishes. Through the channel, Plaintiff Chmura provides firsthand observations and candid opinions based on trips she personally undertakes and pays for. Plaintiff Chmura does not accept free or discounted travel, lodging, or services from cruise lines, airlines, hotels, or other travel-related entities, and the content on the channel reflects her independent, unsponsored viewpoints.

11. At least one video from the "Let's Go Team" YouTube channel appears in the dataset "HD-VILA-100M, which Defendant used to train its AI video-learning architecture.

12. Plaintiff and Class Members derive value from their Works through viewership, advertising, sponsorships, licensing, and other monetization that depends on controlled distribution and

3

**CLASS ACTION COMPLAINT**

the ability to choose whether, when, and how their Works will be licensed for downstream uses, including AI model training.

13. Plaintiffs and the Class Members are independent content creators of audiovisual content hosted on YouTube.

14. Defendant Snap Inc. is a Delaware corporation with its principal place of business located at 3000 31st Street, Santa Monica, CA 90405.

## FACTUAL ALLEGATIONS

**A. YouTube's Access-Controlled Distribution of Creator Works**

15. YouTube is a video-sharing platform on which creators upload original audiovisual works. Those works are protected by copyright, and creators retain rights and control over licensing and other downstream uses.

16. YouTube provides access to videos primarily through controlled streaming. YouTube's design is intended to enable real-time viewing and limited download features available to those users who have purchased a "Premium" license from YouTube.

17. YouTube employs technological protective measures ("TPMs") to limit file-level acquisition and bulk extraction of underlying audiovisual files.

18. YouTube's Terms of Service expressly bar scraping, unauthorized downloading, bulk extraction, and other forms of data mining of audiovisual content except through expressly permitted product features or licensed APIs. Those contractual limits operate in tandem with YouTube's TPMs to prevent unlicensed, file-level access to creators' videos and to ensure that content is accessed only through YouTube's controlled platform.

19. Indeed, YouTube has publicly stated that if AI companies are scraping videos hosted on its website for use in AI training models, it would be considered a "clear violation" of YouTube terms of service.[1]

---

[1] Paolo Confino, *OpenAI Could Be in a "Clear Violation" of YouTube's Terms of Service, CEO Says—Depending on How It Trains Its Sora Video Tool*, Fortune (Apr. 4, 2024), available at: https://fortune.com/2024/04/04/openai-youtube-clear-violation-terms-service-ai-sora-training/ (last visited February 17, 2026).

20. Content creators (including Plaintiff) who upload videos to YouTube grant YouTube and other users limited permissions to access that content through YouTube's services. But the license language makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service." In other words, end users are permitted to view or stream videos within YouTube's environment, not to obtain or use the underlying audiovisual files outside the Service. YouTube's Terms of Service thus reflect YouTube's intent to restrict access to the digital files underlying the videos that users are allowed to stream.

21. Streaming a video through YouTube and downloading a permanent copy offer materially different value propositions—free viewing supported by advertisements versus possession of a lasting digital copy. Scraping or bulk downloading is therefore not simply copying material that YouTube provides to the public; it is an act of unauthorized access to audiovisual data files that YouTube affirmatively withholds from public download.

22. Although YouTube offers certain download functionality to paying subscribers (e.g., YouTube "Premium"), YouTube's TPMs restrict that functionality in ways that prevent users from obtaining the underlying audiovisual files. YouTube prohibits downloading audiovisual content except through the YouTube application, and any "download" makes content available only for offline streaming within the app—not as a transferable, permanent file copy. The offline access is also time-limited, after which the content reverts to online streaming only.

23. To enforce these prohibitions, YouTube uses technological processes to identify and prevent unauthorized extraction. For instance, YouTube periodically updates APIs in ways that disrupt non-authorized downloaders relying on outdated interfaces to extract files. YouTube also monitors downloading behavior and may throttle, restrict, or block IP addresses associated with excessive download attempts over a specified period.

24. YouTube's TPMs are actively maintained and updated to prevent automated download tools from reliably reconstructing full video files outside YouTube's player-based environment.

25. In addition, YouTube maintains a framework based on express permission that allows creators to decide whether third-party AI companies may use their YouTube videos for AI model training.

5

**CLASS ACTION COMPLAINT**

26. Under YouTube's policy and settings, creators may permit third-party training only by turning on a "third-party training" setting and selecting which third-party companies, if any, are allowed.

27. By default, YouTube's third-party training setting is turned off—meaning creators do not need to take any action to withhold permission, and third-party training is not authorized unless the creator affirmatively opts in.

28. Even when a creator chooses to opt in, YouTube requires the creator to make an affirmative choice: either (a) select one or more companies from YouTube's list of participating third-party AI companies, or (b) choose an "all third-party companies" option that grants permission broadly.

29. In other words, YouTube does not treat creators as having granted permission to any third-party AI company unless and until the creator affirmatively authorizes such use.

30. YouTube's list of third-party companies presented to creators includes major AI developers, reflecting that YouTube contemplated that third-party AI developers would require explicit creator permission before using YouTube videos for training.

31. Plaintiff and Class members, who are YouTube content creators, post their original works to YouTube and rely on YouTube's controlled-access architecture to protect the value of their Works and to preserve licensing markets, including the emerging market for AI training licenses.

32. Most YouTube videos are not registered with the U.S. Copyright Office. But that does not make them free to take or use. Creators still pour real time, skill, and money into producing their videos, and they depend on YouTube's technological safeguards to keep the underlying files from being accessed and downloaded without permission. And because a DMCA circumvention claim does not hinge on copyright registration, these protections matter most in exactly this situation—where Defendant's misconduct is breaking through access barriers that are designed to prevent anyone from obtaining the underlying video files.

6
**CLASS ACTION COMPLAINT**

**B. Snapchat Improperly Obtained YouTube Videos for Training AI Architecture**

33. Defendant is a technology company that owns and runs the Snapchat social-media platform, through which users connect and communicate by sharing photos, short-form videos, and related content.

34. Through Snapchat, Defendant offers users artificial-intelligence features and tools that enable the creation, modification, enhancement, and manipulation of images and video clips.

35. Beyond operating Snapchat, Defendant is engaged in the development of generative AI technologies, including an AI-based video generator and related products that Defendant intends to integrate into—and monetize through—its business operations.

36. Building, refining, and commercializing these AI products requires enormous volumes of digital training data. To obtain this material, Defendant has pursued large-scale video datasets containing millions of videos, including existing curated datasets such as "HD-VILA-100M."

37. HD-VILA-100M, is comprised entirely of YouTube videos and contains 3,098,462 source videos divided into roughly 100 million clips. The dataset was compiled by Microsoft Research Asia and published in 2021 for research in video-based AI.

38. The HD-VILA-100M license (which is a license only to the dataset compilation and not the underlying material) limits use to computational, non-commercial research, and forbids using the data or resulting outputs in any commercial product or service.

39. By including these restrictions, Microsoft implicitly acknowledged that HD-VILA-100M draws from protected works and does not provide commercial authorization to exploit the underlying videos.

40. HD-VILA-100M does not include the actual underlying video files. Any user of the dataset must download the referenced clips directly from YouTube. Defendant did so at scale.

41. Defendant obtained and used HD-VILA-100M despite its non-commercial limitations. Defendant knew the dataset was for research, but used it for commercial training and development of its generative AI model and used it as a guide in scraping YouTube content without consent from YouTube or creators.

42. Defendant's reliance on the HD-VILA-100M dataset has not been limited to academic experimentation or a one-off research initiative. Instead, it forms part of a broader commercial strategy: to build a competitive generative video model and deliver products and services for paying customers, including creators and artists.

43. Defendant used the HD-VILA-l00M dataset as the foundation for its own refined dataset known as Panda-70M.[2]

44. Panda-70M is a collection of 3.8 million videos from YouTube split into approximately 70.7 million clips paired with text captions. It was compiled by Defendant and released in 2024.

45. Defendant used the Panda-70M dataset to identify and scrape audio and video content from YouTube without the knowledge or consent of YouTube or the creators of the content.

46. Defendant also obtained its own separate audio and video datasets directly through its own independent scraping of YouTube's video sharing platform without the knowledge or consent of YouTube or the creators of the content.

47. Because Defendant aimed to compete in the crowded AI market, it faced intense pressure to obtain training data at extraordinary scale. Rather than secure that data through negotiated licenses and authorized access, Defendant bypassed YouTube's TPM's to obtain the volume of video content needed to power its generative AI ambitions and gain an advantage in that market.

48. Defendant has devoted substantial resources to generative AI and has worked to improve the underlying generative capabilities of its systems. Relevant here, Defendant sought to build a model that can convert written prompts and/or images into audiovisual outputs—i.e., a system that receives text instructions or image inputs and generates corresponding video content.

49. Training generative AI systems is data-intensive by design: performance improves with scale, and Defendant therefore required massive quantities of training material to develop and optimize its generative AI products.

---

[2] Tsai-Shien Chen, Aliaksandr Siarohin, Willi Menapace, Ekaterina Deyneka, Hsiang-wei Chao, Byung Eun Joen, Yuwei Fang, Hsin-Ying Lee, Jian Ren, Ming-Hsuan Yang, Sergey Tulyakob; "Panda-70M: Captioning 70M Videos with Multiple Cross-Modality Teachers," Feb. 29, 2024, available at https://arxiv.org/abs/2402.19479 (last viewed February 17, 2026).

8

**CLASS ACTION COMPLAINT**

**C. Snapchat's Acquisition of YouTube Videos Required Bypassing YouTube's Technological Access Controls**

50. Because YouTube's TPMs restrict file-level bulk extraction, Snapchat could only obtain YouTube videos at the necessary scale by defeating or bypassing those measures, including by using circumvention tooling that obtains video files outside YouTube's authorized access pathways.

51. On information and belief, Snapchat incorporated evasion mechanisms and anti-detection measures designed to circumvent YouTube's TPMs.

52. Defendant—acting directly and through its agents, contractors, and affiliates—intentionally accessed large volumes of YouTube videos using scraping and/or other tools and workflows designed to bypass or evade YouTube's technical protection measures and usage restrictions.

53. As used here, "scraping" refers to the automated downloading of audio and video files from a website—here, YouTube—through scripted or other non-manual processes.

54. Defendant built datasets, including Panda-70M, which it used as a guide to independently scrape content from YouTube without the knowledge or consent of either YouTube or the creators whose works were taken.

55. Defendant's scraping required the use of methods designed to bypass YouTube's technical safeguards that restrict unauthorized access to the underlying digital audiovisual files.

56. These methods are not part of ordinary, consumer-facing use of YouTube; rather, they are specialized steps used to obtain the underlying files themselves outside of YouTube's intended streaming environment.

57. On information and belief, Defendant employed tools and techniques including the open-source YouTube downloader "yt-dlp," together with virtual machines or comparable infrastructure used to rotate and refresh IP addresses while pulling content from YouTube.

58. IP rotation through virtual machines (or similar systems) is necessary because YouTube monitors downloading behavior associated with particular IP addresses and restricts or blocks IP addresses exhibiting automated or high-volume download activity.

59. The yt-dlp tool is designed to download audio and video content from online platforms including YouTube. It can, among other things, automatically retrieve audio and video streams, merge them into a single file, and download multiple videos or full playlists. On information and belief, Defendant used yt-dlp to download content at scale, merging separate audio and video streams, and retrieving playlists or other bulk collections of underlying files.

60. Snapchat's circumvention was willful. Snapchat is a sophisticated technology company familiar with YouTube's access controls and anti-scraping protections, and Snapchat knowingly chose circumvention-based acquisition rather than licensing creators' works through authorized channels.

61. On information and belief, Snapchat mass acquisition of YouTube videos for AI training involved "circumvent[ing] a technological measure that effectively controls access" to copyrighted audiovisual works, within the meaning of 17 U.S.C. § 1201(a).

62. On information and belief, Snapchat further "avoid[ed], bypass[ed], remove[d], deactivate[d], or impair[ed]" technological measures designed to restrict unauthorized retrieval and copying of YouTube content, including at a scale far beyond ordinary consumer viewing.

63. Snapchat's conduct was not an incidental or accidental access event; rather, it was undertaken deliberately and systematically to acquire an enormous volume of copyrighted audiovisual works for use in training commercial AI systems.

**D. Snapchat's Commercial Motive**

64. Defendant's work to train and develop generative AI was directed at advancing Defendant's own commercial objectives and financial interests.

65. Defendant's generative AI initiative is intended to yield a market-ready, commercially competitive video-generation model aimed at monetizable end users—particularly creators and artists.

66. Defendant's financial stake in these generative AI products is substantial and multi-faceted, including direct benefits to Defendant's broader business, revenue streams, and platform operations, including Snapchat.

67. AI already functions as a core component of Defendant's platform, including AI-driven facial tracking, image processing, and related creation tools used to generate "Snaps"—the individualized images and content produced at users' direction.

68. Defendant publicly promotes these AI capabilities through a company webpage[3], which invites users to try Defendant's "first Open Prompt Image Generation Lens," enabling users to create, edit, and recreate Snaps by entering prompts, using what Defendant describes as its latest AI innovations for sharing on Snapchat.

69. Defendant also markets an "Easy Lens" tool that purports to let users build visual experiences using only a text prompt.

70. Defendant further positions AI as a key driver of its "Spectacles" product—wearable, computer-enabled glasses that Defendant has been developing and has represented it expects to introduce in 2026—and intends for AI to power augmented-reality experiences for the wearer.

71. Defendant therefore has a direct commercial interest in improving its AI features to expand engagement and market share among both content creators and viewers across Defendant's social-media platform and other products and services it offers.

72. In short, Defendant's generative AI training efforts are commercially motivated and designed to support revenue generation and competitive positioning.

E. **Defendant's Actions Caused Harm to Plaintiff and Class Members**

73. Creators like Plaintiff and the Class Members cannot meaningfully "undo" what Defendant has done. Once an AI system ingests a work during training, as is the case here, the value of that work is extracted and embedded into the model in ways that cannot be reliably removed or recalled.

74. Defendant never sought or obtained authorization from Plaintiff or Class Members to access or use the videos Defendant took for AI training.

75. Defendant never never paid Plaintiff or Class Members for the access, copying, ingestion, and use of their YouTube videos within AI training pipelines and related workflows.

---

[3] https://newsroom.snap.com/imagine-a-new-way-to-create-with-lenses (last viewed February 17, 2026)

76. Plaintiff and Class Members selected YouTube as a primary platform for publishing their works in substantial part because YouTube's terms and TPMs prohibit the very scraping, unauthorized access, and bulk downloading conduct Defendant used to obtain Plaintiff's and Class Members' video content.

## CLASS ACTION ALLEGATIONS

77. **Class Definition:** Plaintiff bring this action on behalf of herself and other similarly situated individuals defined as follows:

> All persons and entities in the United States who are creators and/or rights-holders of YouTube-hosted videos that Snapchat accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube through circumvention of YouTube's TPMs (the "Class").

78. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

79. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

80. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

81. <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party YouTube's records.

82. <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class because Plaintiff's Works were included in the datasets used by Snapchat in the training of Snapchat's AI models. Snapchat unlawfully accessed and downloaded the Works through the use of technological measures aimed at

circumventing YouTube's TPMs. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

83. <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

84. <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether YouTube employs "technological measures that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a).

(b) Whether Snapchat accessed YouTube-hosted videos at the file level to obtain training-ready copies, clips, frames, or other stored representations of Class members' Works.

(c) Whether Snapchat retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in HD-VILA-l00M and Panda-70M and any other datasets used by Snapchat at massive scale to build training material for its AI systems.

(d) Whether Snapchat's methods for retrieving YouTube videos defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs.

(e) Whether Snapchat thereby violated 17 U.S.C. § 1201(a)(1) by circumventing technological measures controlling access to Class members' Works.

(f) Whether Snapchat's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain.

(g)     Whether Snapchat's conduct caused Class wide injury by depriving creators and rights-holders of control over access to and use of their Works and by enabling Snapchat's ongoing possession and use of unlawfully accessed copies within its training pipelines.

(h)     Whether Plaintiff and Class members are entitled to declaratory and injunctive relief requiring Snapchat to cease circumvention-based access to YouTube-hosted Works and to implement compliance measures sufficient to prevent further circumvention.

(i)     Whether Plaintiff and Class members are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Snapchat violations of 17 U.S.C. § 1201.

85.     *Superiority*. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIM FOR RELIEF**

**FIRST CAUSE OF ACTION
VIOLATION OF 17 U.S.C. § 1201(a)
(DMCA ANTI-CIRCUMVENTION)**

86.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

87.     YouTube prohibits scraping, unauthorized downloading, bulk extraction, and other forms of automated retrieval of audiovisual content through access controls to prevent unlicensed, file-level access to the underlying video files.

88. Plaintiff and Class members uploaded and distributed their original Works on YouTube in substantial part because YouTube protects against third parties engaging in bulk downloading or automated extraction of creators' videos outside YouTube's controlled streaming and download pathways.

89. Content creators, including Plaintiff and Class members, reasonably expect that their Works will be accessed only through YouTube's authorized viewing and distribution mechanisms, and will not be accessed at the file level, scraped, downloaded, and copied at massive scale without consent.

90. YouTube's TPMs constitute "effective technological measures" within the meaning of 17 U.S.C. § 1201 because those measures, in the ordinary course of operation, control access to copyrighted audiovisual works and prevent third parties from obtaining file-level copies at scale without defeating those controls.

91. On information and belief, Snapchat used and/or relied on automated tools, services, and methods designed for the purpose of bypassing and circumventing YouTube's TPMs in order to retrieve, extract, and reconstruct underlying video files that YouTube does not make available for bulk download to the public, and, through that circumvention-based harvesting, Snapchat improperly obtained millions of YouTube videos.

92. On information and belief, Snapchat accessed, downloaded, stored, and processed unlawfully obtained YouTube videos (and/or training-ready derivatives such as decoded clips, frames, embeddings, or other representations) to assemble and maintain training materials used to develop, train, and improve Snapchat's AI systems.

93. Snapchat's violations were willful because, among other reasons, Snapchat is a sophisticated technology company that understood YouTube's TPMs, yet knowingly used or relied on automated circumvention methods designed to evade YouTube's anti-scraping protections in order to obtain training data at massive scale.

94. Each act of circumvention constitutes a separate violation of 17 U.S.C. § 1201. Plaintiff and Class members are therefore entitled to statutory damages, injunctive relief, and attorneys' fees and costs pursuant to 17 U.S.C. § 1203.

**RELIEF REQUESTED**

Plaintiff, on behalf of herself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

(b) Declare that Snapchat violated 17 U.S.C. § 1201(a) by circumventing YouTube's TPMs controlling access to Plaintiff's and Class Members' Works;

(c) Enter injunctive relief requiring Snapchat to cease circumvention-based access to YouTube-hosted Works and to implement compliance measures sufficient to prevent further circumvention;

(d) Award statutory damages and/or other damages as authorized by 17 U.S.C. § 1203;

(e) Award Plaintiff and the Class their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(5); and

(f) Award such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: February 18, 2026,                    Respectfully submitted,

*/s/ William J. Edelman*
William J. Edelman (SBN 285177)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: 866.252.0878
wedelman@milberg.com

Michael A. Acciavatti (*pro hac vice* forthcoming)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: 212.594.5300
macciavatti@milberg.com